[No. E000342. Fourth Dist., Div. Two. Apr. 30, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES McALISTER, Defendant and Appellant.

COUNSEL

Frank Di Sabatino, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Keith I. Motley and Roberta L. Woodrick, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MORRIS, P. J.**—Defendant was convicted by a jury of (1) vehicular manslaughter without gross negligence (former Pen. Code, § 192, subd. 3(b), now § 192, subd. (c)(4); Veh. Code, § 21755); (2) driving under the influence of alcohol with injury (Veh. Code, § 23153, subd. (a)); and (3) driving with blood alcohol level of .10 percent or greater with injury (Veh. Code, § 23153, subd. (b)).

Defendant was sentenced to state prison for two years, the midterm, on count 2, as the base term, and to a concurrent one-year county jail sentence on count 1. The two-year concurrent sentence on count 3 was stayed, the stay to become permanent upon completion of the sentence on count 2.

Defendant has appealed.

The sole issue raised on appeal is whether the trial court committed prejudicial error in permitting jurors to directly question defense witnesses. We conclude that the error was not prejudicial.

## THE FACTS

The facts and testimony necessary to an understanding of the possible impact of the jurors' direct interrogation of witnesses were as follows:

The accident giving rise to the charges occurred on Cajon Boulevard near its intersection with Short Street in San Bernardino County. Cajon Boulevard is a north-south roadway with one northbound and one southbound lane. There is an asphalt shoulder on each side of the roadway. There were no street lights in the area. The only illumination in the area was from a motel and a telephone building located near the intersection of Cajon and Short Street.

Officer Raymond English arrived at the scene of the accident at approximately 4:30 a.m. on April 24, 1983. He testified that when he arrived at the scene there was a disabled Oldsmobile facing north in the northbound lane of the roadway, approximately three feet from the center line; a 1965 Chevrolet pickup was parked on the shoulder of the road; a motorcycle was laying on its side; a Plymouth and a van were also parked in the vicinity; and the body of a little girl was lying in the northbound lane north of the Oldsmobile. He testified that he arrested the driver of the Oldsmobile for misdemeanor driving while under the influence of alcohol. (Veh. Code, § 23152, subd. (a).)

Mr. Rockney Rhoades testified that he had been driving northbound when he saw the disabled Oldsmobile and offered his assistance. He testified that he intended to push the disabled Oldsmobile off the roadway with the back of his Chevrolet pickup truck, and that his truck was turned facing southbound in the northbound lane of Cajon Boulevard with the headlights on at the time of the accident.

Mr. James Brown testified that he and his 10-year-old daughter, Shannon Brown, arrived on the scene on a motorcycle just before the accident; that

he parked the motorcycle on the asphalt shoulder and began to assist Rhoades. Shannon Brown remained near the motorcycle on the right shoulder. After the truck was in position to push the disabled Oldsmobile, Brown stood in front of the truck and used his flashlight to direct traffic.

He testified that at this time he saw two vehicles approaching. The first vehicle slowed and passed on the left, moving into the southbound lane. The second car moved to the right of the disabled vehicle onto the asphalt shoulder and struck Shannon Brown and the motorcycle.

Mr. Fidel Rodriguez testified that he was the driver of the first car; that he was driving north on Cajon when he saw the headlights of the truck and the man standing in front of the truck with a flashlight, and that he swerved his Mustang to the left into the southbound lane to avoid the truck.

Defendant testified that just before the accident he was driving north on Cajon approximately three car lengths behind a van; that near Short Street the van started to slow, braked suddenly and without signaling appeared to start into a left turn; that as defendant cleared the van, he noticed an object in the street and his lights hit a bumper of a car which was without lights. He then realized the vehicle was not moving and he moved to the right to avoid hitting it. He did not see any Mustang.

Defendant brought his vehicle to a stop some yards beyond and walked back. Defendant was observed to be unsteady on his feet and to smell of alcohol. He was given a sobriety test and arrested. He was placed in the police vehicle with the driver of the Oldsmobile, and later taken to the hospital for a blood alcohol test by Officers English and Katherine Duerks. His blood alcohol was found to be .12 percent. Shannon died in the hospital.

Additional testimony relevant to the issue on appeal will be discussed in connection with the jurors' questions.

### THE PROCEDURE

Prior to the presentation of the evidence, the judge explained the trial procedure to the jurors. He then invited the jurors to become part of this process by writing down any questions they wished a witness to be asked and submitting the question to the court for review. He explained that if he determined that the question was proper the court would ask the question of the witness.

A few questions were duly submitted to the court and asked of the witnesses pursuant to this procedure. However, when California Highway Pa-

trol Officer Raymond English was recalled as the first witness by the defense, the format changed. In his initial testimony, Officer English had not testified as to any conversation during transportation of the defendant to the hospital. After both counsel had completed questioning English as a defense witness, Juror Sparks was permitted to ask a question in open court as follows: "I just wonder if you remember anything that was said in the car on the way over to the hospital." After the question was restated by the court, the witness answered: "There was some comment made that he [the defendant] said that he didn't see why we were bothering with all this; if it had been a black chick, we wouldn't have gone through all this trouble, and he didn't understand why we were arresting him."

During the testimony of the second defense witness, a Mr. Thakorbhai Patel, who was the owner of the motel where defendant ran to call the police after the accident, several jurors were permitted to question the witness as follows:

"JUROR SPARKS: Is this the only motel in that area?

"THE WITNESS: Yeah.

"THE COURT: Are there any motels within a ten block area of your motel?

"THE WITNESS: I'm the only one.

"THE COURT: You're it? Okay.

"JUROR ROWE: You sleep at the motel, correct?

"THE WITNESS: No.

"JUROR ROWE: Is there someone that does stay there?

"THE WITNESS: I stay there.

"JUROR ROWE: You do stay there? And is it marked 'Manager'?

"THE WITNESS: No, I stay there and I manage it all.

"THE COURT: Anything further?

"Anybody else?

"JUROR HUBBS: Which person came first?

"THE WITNESS: This person came first. (Pointing.)

"JUROR HUBBS: He came first?

"THE COURT: Referring to Mr. McAlister.

"THE WITNESS: They got accident. They get out, and they came to the office.

"JUROR HUBBS: He came first, then the other one; is that right?

"THE WITNESS: Yeah."

Finally, additional direct juror questioning was permitted during the testimony of Mr. John Northcutt. Northcutt was also a defense witness who had arrived at the scene after the accident. Prior to the interrogation by the jurors, Northcutt had testified, inter alia, that defendant approached the van in which he was sitting with a friend and asked for help and asked them to call the police; that he tried on his CB but was unsuccessful; that after he was unsuccessful in getting the police, defendant ran over to the motel and Northcutt's friend drove off in the van to contact the Highway Patrol. Northcutt followed defendant to the motel and saw him use the phone.

He had also testified that when he arrived at the scene the lights were off on all of the vehicles. He saw the disabled vehicle in the middle of the road and another vehicle off on the shoulder to the north, and the little girl lying in the roadway "kind of close" to the Chevy (Oldsmobile). The little girl was toward the middle of the street and the crashed up bike was on the street to the east side. He had also observed a truck on the other side of the street. He did not see a Mustang at the scene.

When he followed defendant back to the roadway, there were other people standing around including people he identified as "Mexican brothers."

Following the completion of his cross-examination by the district attorney, a number of questions were asked by the court and jurors. Initially these questions merely repeated questions that had already been answered. They continued as follows:

"JUROR GRAVES: When you came upon the scene of the accident, you were traveling north?

"THE WITNESS: Yes.

"JUROR GRAVES: And you said there were no lights?

"THE WITNESS: No lights.

"JUROR GRAVES: How did you notice that there was an accident?

"THE WITNESS: How did I notice there was an accident? For one thing, I seen something in the middle of the road, although the street, the road up there is dark, but you can tell if there's something in the middle of the street, even if it's dark.

"And then plus that, we wasn't going that fast neither at all. We was only doing about like twenty miles per hour.

"THE COURT: Yes, ma'am?

"JUROR PARRA: Again, could you tell me where the motorcycle was?

"THE WITNESS: Okay. The motorcycle was a little over toward this way, and the girl was a little over toward this way. So they was close, but they wasn't that close.

"JUROR BUNTING: Did you drive around them to park?

"THE WITNESS: Yes, we drove around.

"JUROR BUNTING: North of them?

"THE WITNESS: Yeah, we went on this side of them 'cause we was coming up behind the situation, and there was somebody out there with a little tiny flashlight. That's the only light that was out there, and that was after the accident.

"THE COURT: Mrs. Parra?

"JUROR PARRA: But no Mustang was right there when you came to the scene? There was no Mustang?

"THE WITNESS: I didn't see no Mustang. I did not see a Mustang.

"JUROR PARRA: Did you see the Mexican brothers, as you referred, close to a Mustang, close to any vehicles?

"THE WITNESS: No, I seen them closer to the girl than the Mustang.

"JUROR PARRA: But you didn't see a Mustang?

"THE WITNESS: I didn't see a Mustang. If there was one there, I didn't see it.

"JUROR ROWE: What direction did Mr. McAlister come from to your van to ask for help?

"THE WITNESS: I don't know exactly which way he come from.

"JUROR ROWE: Which side of your van?

"THE WITNESS: He ran up on the driver's side.

"JUROR ROWE: But you don't know which direction, from in front of you or from behind you?

"THE WITNESS: No, I have no idea."

Immediately following this interrogation by the jurors, the district attorney stated that he had a few more questions on cross-examination, and continued as follows:

"Q. When you mentioned, in response to one of the juror's questions, about the lights was off, in other words, how did you see anything? There's nothing to obstruct anybody's vision up there, is there?

"A. To obstruct the vision?

"Q. Well, Cajon Boulevard is a long, straight stretch?

"A. Yes.

"Q. As you were coming up on this, you could tell that there was something there, although you didn't quite know what it was; is that correct?

"A. It looked like a blotch in the street, yes.

"Q. And the closer you got, the more you were able to kind of figure out what was going on?

"A. In a way, yeah. Well, we was going slow, too. I mean he was going very slow, I mean very slow.

"Q. But as you came upon it, you could see it more clearly?

"A. Yeah.

"Q. And you didn't have any trouble getting around it, did you?

"A. No, we just slowed down and just went around it and parked right about in there, in between the two cars."

At the conclusion of the testimony of Northcutt and before the defendant was called as a witness, District Attorney Martin and Defense Attorney McGuire requested a conference in chambers, at which the following objections were made:

"MR. MARTIN: If I may be permitted to go first?

"Ms. McGuire and I had a conversation this morning. We spoke briefly to you in chambers.

"I don't have any particular legal reason for doing so, and it's not unusual at all for Judges to encourage jurors to write questions. My only concern was as a participant in the trial yesterday afternoon, when sort of the floor was opened for the jury to entertain questions to particular witnesses, I seemed to sense—and I'm not trying to be dramatic—sort of like a current go through the jury and their body language changed. They got excited, and all of a sudden, some of them were writing down questions.

"My only concern is that they might get a little bit more concerned with thinking of questions to ask, and that distracts them from actually listening to the evidence.

"I thought about it last night, and then I got to thinking, too, well, you know, maybe it's just because this is something new and not done; that it's just maybe an attorney's natural reaction to some change because we get in grooves and want to maintain the status quo. Philosophically, I don't agree with that. I don't disagree with the situation, but that is something—an observation that I made and a concern that I have that I thought I'd like to bring to your attention.

"THE COURT: All right.

"Ms. McGuire?

"Ms. McGUIRE: Thank you.

"I would like to make a formal—rather, two formal motions.

"One is for a mistrial based on the active participation of the jurors.

"And in the event that motion is not granted, I would like to enter formal objection to any further proceedings wherein the jurors actively participate, whether by written questions or by a more active verbal role.

"And my reasons for that are, first of all, for either counsel, but I'm more concerned with the defense problems. I feel that we cannot fairly and objectively raise objections to the questions when we're actually addressing our objections to the actions of the jurors. It takes away the objectivity, and we no longer have a neutral party ruling with the questions coming from counsel and the witnesses answering. And I can't interfere. I felt to try and object yesterday would have been detrimental to the defense because I think they would take it in a personal fashion.

"THE COURT: Did you find any of their questions objectionable?

"Ms. McGUIRE: I would have to review them.

"I recall at the time that there were some that I would have objected to had counsel asked instead of the jurors, yes.

"THE COURT: On what grounds? I'm interested because I listened carefully to the questions as they came down, and I found that they were all relevant and very much to the point.

"I found it, as I told you at side bar, refreshing to see their intensity in the case. And they're the people whose questions must finally be answered before we can make a decision."

Following this conference the court admonished the jury not to become advocates in the case and encouraged them to write their questions out. Thereafter, the jurors apparently followed that procedure.

### DISCUSSION

Appellant contends that the trial court committed prejudicial error in permitting unrestrained questioning of defense witnesses by jurors.

After careful review of the whole record, we are convinced that, although there was error resulting from the manner in which the questions were presented, the error was not prejudicial.

In a proper case there may be a real benefit from allowing jurors to submit questions under proper control by the court. However, in order to permit the court to exercise its discretion and maintain control of the trial, the correct procedure is to have the juror write the questions for consideration by the court and counsel prior to their submission to the witness. (See *People* v. *Gates* (1979) 97 Cal.App.3d Supp. 10 [158 Cal.Rptr. 759].)

We have found no California case discussing the issue of direct questioning of a witness by a juror in a criminal case. Only one civil case has addressed the problem. In *Maris* v. *H. Crummey, Inc.* (1921) 55 Cal.App. 573, 578-579 [204 P. 259], the appellant contended that the court had erred in permitting improper jury questions. The court rejected this contention on the ground that the appellant had failed to object to the questions in the trial court. The court did not state what the questions were or describe the way the questions were propounded.

In the case at bar, objection was made to the manner in which the questions were asked. We hold that at least in a criminal case it is unnecessary for counsel to make an objection to the improper nature of the questions propounded by a juror in order to preserve the right to raise the error on appeal. We agree with the courts from other jurisdictions that have held that the risk of prejudice is too great to require counsel to be put to the choice of offending a juror by an objection or of letting improper or prejudicial testimony go in without the right to later review. (See *State* v. *Sickles* (1926) 220 Mo.App. 290 [286 S.W. 432, 433]; *Krause* v. *State* (1942) 75 Okla.Crim. 381 [132 P.2d 179, 182].)

The rationale of these cases is that a juror is not selected for the purpose of asking questions and is not expected to take the place of counsel in the trial of the case. Therefore, when the court permits a juror to propound questions to a witness, the juror, to some extent at least, represents the court. It is therefore the duty of the court to see to it, without objection being made, that no improper questions are asked of a witness by a juror. (*Sparks* v. *Daniels* (Mo.App. 1961) 343 S.W.2d 661, 667.)

Our examination of cases from other jurisdictions reveals that direct juror questioning has been recognized as proper by some courts as an aid to the jury in understanding the evidence. It has generally been allowed where a juror has been permitted to ask an occasional question in order to clarify a statement made by a witness. (*Sitrin Brothers, Inc.* v. *Deluxe Lines, Inc.* (1962) 35 Misc.2d 1041 [231 N.Y.S.2d 943, 945-946]; *Krause* v. *State, supra,* 132 P.2d at p. 182.) Nevertheless, even where the practice has been encouraged, the courts have emphasized that the privilege must be exercised with extreme caution and under strict admonition from the trial judge.

In other cases the courts, recognizing the risk of prejudice in direct questioning by jurors, have discouraged the practice. (See *Pacific Improvement Co.* v. *Weidenfeld* (2d Cir. 1921) 277 F. 224; *State* v. *Anderson* (1945) 108 Utah 130 [158 P.2d 127, 128-129].)

Whether the practice of direct questioning of witnesses by jurors is approved or criticized by the particular court, there is general agreement that the irregular proceeding must result in actual prejudice before an appellate court is justified in disturbing the judgment.

 Although we hold the view that the practice is inherently dangerous and should be discouraged, we agree that as a reviewing court we are limited to a determination of whether prejudice resulted in this case.

 An examination of the general hazards of the procedure is helpful in ascertaining the existence of prejudice in the particular case. They are as follows:

1. As already noted, counsel is placed in the intolerable position of either offending the juror by objecting or permitting improper and possibly prejudicial testimony to come in without objection.

2. The involvement of the juror in the process of interrogation may lessen his or her objectivity and cause a premature judgment on some issue in the case.

3. Personal interaction between juror and witness may produce tension or actual antagonism in the juror.

 Reviewing the jurors' questions in the light of these concerns, we find only one instance where an objection to a specific question would have been felicitous. When Juror Sparks asked what was said by the defendant on the way to the hospital, the question should not have been propounded to the witness without counsel having an opportunity to object outside the presence of the juror.

Neither counsel had previously opened up this area, its relevance was extremely questionable and the answer potentially prejudicial. The answer with racist overtones could very well have been offensive to the jurors.

Because this was the only instance of inadmissible matter and because the remaining questions were competent, although in some instances repetitious, did not indicate any prejudice against the defendant and, if anything,

were favorable to defendant, we conclude that no prejudice occurred as a result of the objectionable matter.

We are concerned about the juror conduct described by the prosecutor, Mr. Martin, in stating his objection to the procedure. The change in their attitude from vigilant observers to excited participants highlights the danger inherent in the process of direct questioning. However, we again conclude from a review of the remainder of the trial that no harm was done by the brief irregularity in the proceedings.

Following the chamber conference, the trial judge admonished the jurors on the importance of their role as objective triers of the facts and that they were not to become partisans or advocates for either side. He again described to them the appropriate procedure to be followed in the event they had questions for the witnesses. The remainder of the trial was conducted without deviation from the normal procedure.

We are satisfied that the defendant had a fair trial, that the brief irregularity did not prejudice the defendant and that the error that did occur was harmless. It is not reasonably probable that a result more favorable to defendant would have resulted in the absence of the direct jury questioning.

### SENTENCING

■ Although the parties do not raise the issue, it is settled that where for a single act concerning one victim there is a finding of guilt both for driving under the influence of alcohol with injury in violation of Vehicle Code section 23153 and for vehicular manslaughter in violation of Penal Code section 192, subdivision 3, as is here the case, the application of Penal Code section 654, which bars punishment by more than one provision of the code for the same act or omission, is invoked. The appropriate remedial procedure is to permit the greater sentence to stand and to stay execution of the lesser. (See *People* v. *Milham* (1984) 159 Cal.App.3d 487, 507 [205 Cal.Rptr. 688; *People* v. *Young* (1964) 224 Cal.App.2d 420, 425 [36 Cal.Rptr. 672].)

The judgment is affirmed. The trial court is directed to issue a corrected abstract of judgment to correctly reflect the sentence as follows:

Count 2, Vehicle Code section 23153, subdivision (a), driving under the influence of alcohol with injury, midterm of two years as the principal term;

Count 1, Penal Code section 192, subdivision 3(b), vehicular manslaughter, one year county jail concurrent to count 2, count 1 stayed, the stay to become permanent upon completion of sentence on count 2; and

Count 3, Vehicle Code section 23153, subdivision (b), driving with blood alcohol level of .10 percent or greater with injury, midterm of two years concurrent to count 2, count 3 stayed, the stay to become permanent upon completion of sentence on count 2.

McDaniel, J., and Rickles, J., concurred.