Filed 7/15/21  P. v. Ray CA3
Opinion after recall of remittitur

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

|  |  |
|---|---|
| THE PEOPLE, | C087304 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF017233) |
| v. | |
| ANDREW JOSEPH RAY et al., | |
| Defendants and Appellants. | |

Defendants Andrew Ray and Phillip Kempton broke into a CVS Pharmacy to steal drugs.  Kempton was arrested shortly after leaving the store.  Ray fled in his Honda Civic but abandoned the car after a police pursuit, leaving his cell phone, wallet, and identification behind.  A jury convicted Ray and Kempton of second degree burglary. (Pen. Code, § 459.)[1]  The jury also convicted Ray of evading police while driving recklessly (Veh. Code, § 2800.2) and resisting an officer (§ 148, subd. (a)(1)).

---

[1]  All statutory references are to the Penal Code unless otherwise designated.

1

Ray contends the trial court should have granted a mistrial after a police witness referred to Ray's probation officer. Defense counsel did not ask the court to admonish the jury to disregard this testimony. However, counsel argued that subsequent testimony from the same witness implied Ray's involvement with other crimes and requested a mistrial. The trial court denied the request. We find no prejudicial error. These references were fleeting and other evidence implicating Ray in the CVS burglary was strong. Ray would not have obtained a more favorable outcome in the absence of this testimony.

Both Ray and Kempton contend the court favored the prosecution by allowing only the prosecutor to ask jurors' questions of witnesses. Again, there was no error. It is proper procedure for a party's counsel to ask jurors' questions of a witness called by that party. The prosecutor asked all the jurors' questions because only the prosecution called witnesses.

Kempton contends that the court abused its discretion in denying defense counsel's request for a four-week continuance to prepare a sentencing brief. Other than the conclusory assertion that a defense sentencing brief would aid the judge in determining the appropriate sentence, Kempton has failed to show that a continuance would be useful. Kempton's alternative argument that defense counsel was ineffective for failing to submit a timely sentencing brief ignores that counsel made an effective oral presentation and the court agreed to a 50-50 split in his sentence, half to be served under supervision, which was a favorable outcome for Kempton.

We granted Kempton's request to recall the remittitur and requested supplemental briefing on retroactive application of the amendment to section 667.5, subdivision (b), which limited the one-year enhancement for a prior prison term to a term served for a "sexually violent offense." (§ 667.5, subd. (b).) The trial court imposed a one-year enhancement for a prison term that Kempton did not serve for a sexually violent offense.

2

The People agree, as do we, that the amendment to section 667.5, subdivision (b), applies retroactively to this case and the one-year enhancement should be stricken.

The one-year prior prison term enhancement imposed on Kempton is stricken. The judgments are otherwise affirmed.

## FACTUAL BACKGROUND

In the early morning hours of January 5, 2017, police officers were dispatched to a CVS Pharmacy in Woodland, California regarding a possible break-in.

An officer saw a person coming out of the window of the CVS. The person was wearing black clothing and had a white mask or bandanna covering his face. The person got into the driver's seat of a car. The license plate of the car was 5UZX599.

Another police officer observed a black Honda Civic parked in the CVS lot. This officer saw someone get into the driver's side of the car. The car drove away with its headlights and taillights off and the officer followed. The Civic began to pull away from the officer's patrol car, reaching over 50 miles per hour in a 25-mile-per-hour zone. The Civic ran stop signs and stoplights, accelerating to 75 miles per hour in a 30-mile-per-hour zone. The officer saw the Civic turn, came up to the street where the car turned, and saw it roll slowly into a street sign. The driver's door was open and there was no one in the car. Police officers searched the area but were unable to locate the driver.

A police detective searched the car. He found two bottles of liquid medication on the passenger seat and more bottles on the floorboards of the driver's side. There was a bottle of liquid promethazine hydrochloride in the back seat. A cell phone was plugged in and the car keys were in the ignition. The detective also found a black hoodie sweatshirt, a white garbage bag, and gloves. A wallet found in the car contained Ray's driver's license. A registration card showed the Civic was registered to Ray and an insurance card was in Ray's name.

A police officer at the rear of the CVS saw a person walking quickly away from the store towards an apartment complex on the other side of the street. This person was

3

wearing a gray hoodie sweatshirt and pants with white splotches on them. The officer followed in his patrol car, shining the spotlight on the person who kept walking. The officer pulled into the apartment complex parking lot, got out of his car, and followed the person on foot. The officer shouted for the person to stop but he kept walking and ducked out of sight. The officer continued to shout and eventually the person came out and was handcuffed by the officer. The officer identified that person in court as Kempton. The officer searched Kempton and obtained his cell phone and wallet containing his identification.

When officers entered the CVS with keys provided by the manager, they found a shattered window on the right side of the store by the emergency door and a rock by a pillar. This was the window the officer saw a person climb out of. The window was shattered but the glass held together, so that a person could push the shattered glass open and climb out. Inside, the window to the pharmacy was broken. There was broken glass on the counter, medicine bottles on the floor, and a large rock inside on the floor in the pharmacy. A safe in the pharmacy contained hydrocodone and promethazine with codeine. Hydrocodone is a strong pain medication that is sold under the brand names Vicodin and Norco. These drugs were kept in a safe because they are the most at risk to be stolen. They have street value because people use them to get high.

The CVS has surveillance cameras in the pharmacy. Video from January 5, 2017, showed two individuals, one wearing a dark-colored top and the other a lighter colored, possibly gray top. The person in the dark top had a white bandanna on his face and appeared to be the same individual seen coming out of the window and getting into the Civic. He was wearing gloves. The person in the gray hoodie was wearing a white mask. He had on acid-washed jeans with lighter and darker colors on the bottom. He was also wearing gloves. An officer who inspected the CVS testified at trial that wearing gloves would prevent a person from leaving fingerprints.

4

The people in the video went directly to the location where the medications with street value were stored. The safe was closed when police inspected the store. Not all controlled substances were kept in the safe. One individual shown on the surveillance video appeared where liquid medications are kept, including promethazine without codeine which was not kept in the safe.

Six days later a police officer assigned to the narcotics task force interviewed Ray about the burglary. Ray stated repeatedly that he was sure he had last driven his car in downtown Sacramento on the night of January 5, 2017. Ray's car had been in the custody of the police since early morning on January 5. When so informed, Ray stated that he must have been confused and changed the date to January 4. Ray stated he was drinking at a bar when his car was stolen. The investigator informed Ray that his wallet was found in the car with his ATM card and identification inside. Ray explained that he was able to get into the bar without identification because he knew the doorman and did not need his ATM card because he paid cash. Ray told the officer he woke up in the house of a woman in Land Park and walked back to where his car had been parked. Asked about the substantial distance involved, Ray said the house was not in Land Park but in a park near downtown that he could not name. Ray stated that when he learned his car was stolen, he called his girlfriend to pick him up. When the investigator pointed out Ray's cell phone was found in the car, Ray explained that he had left his phone in the car to charge and he called his girlfriend from a 7-Eleven using the $3 he had left in his pocket. When asked for the number of the girlfriend who picked him up, Ray started to provide it, then said he forgot it, then said that he wanted to talk to her first, and then said that he did not want the officer to talk to her because it was irrelevant. Ray said he did not know Kempton.

Ray said he reported his car stolen to the Sacramento Police Department. The police department had no record of a report of a stolen car under Ray's name or with his license plate number 5UZX599.

Pursuant to a search warrant, both Ray's and Kempton's cell phones were searched by a method that required destruction of the phones to obtain stored data in a readable form. The officer who interviewed Ray reviewed the data.

Data from Kempton's phone indicated that, from December 2, 2016, to January 4, 2017, there were 68 to 70 phone calls between Ray's and Kempton's cell phones. Kempton's phone also contained an Instagram conversation with another person regarding selling Xanax and Norco, drugs commonly sold on the street. The Google search history on the phone from the afternoon of January 5, 2017, included the term "Woodland pharmacy," and there was an image of the CVS logo and a screenshot of a Google search query for a Woodland pharmacy.

Data from Ray's phone indicated approximately 25 calls from December 28, 2016, to January 4, 2017, between Ray and Kempton (referred to as "Philthy"). In a text message from Ray to his girlfriend, "Jasmine," between 2:00 a.m. and 2:45 a.m. on January 5, 2017, Ray stated, "OMW [on my way] back. It was bad." There were photographs of the CVS in Woodland on Ray's phone.

Based on DNA swabs from Ray and Kempton and from gloves obtained by police at the scene, a criminalist testified that DNA from one glove matched Kempton.

## DISCUSSION

### *Denial of Motion for Mistrial*

Ray contends that the trial court erred in denying his motion for a mistrial. Ray argues that he suffered incurable prejudice when a police officer testified to Ray having a probation officer and then testified in a manner that Ray claims implied he had a probation officer. We disagree.

On direct examination by the prosecutor, the police officer who interviewed Ray testified about contacting him. On cross-examination, Ray's counsel asked, "this conversation that you had with Mr. Ray on the 11th, that's when either you or another officer reached out to Mr. Ray and asked him to come and meet you?" The testifying

officer responded: "His probation officer." Ray's counsel asked for a sidebar, after which the court advised the jury that the officer's conversation with Ray could only be considered as it related to Ray, not Kempton.

On further cross-examination, Ray's counsel asked why other officers were present at the interview if the police officer testifying at trial was the only one asking Ray questions. The witness responded: "One of the officers, it was his facility. That was his office and he works directly with Mr. Ray. And the other was my partner. We went there together."

The trial judge dismissed the jury to confer with counsel. Ray's counsel asked the court to consider a mistrial based on the officer mentioning Ray's probation officer and his subsequent reference to other officers in the room. As to the second reference, the court observed, "you asked the question who else was in the room, and he very carefully said the person whose office we were using, the person who works with Mr. Ray. You asked the question knowing full well what he might say."

As to the first reference to Ray's probation officer, the court asked if defense counsel wanted a mistrial declared based on that reference. The court said: "[Y]ou asked to approach the bench, and at bench, you objected to that question, and I gave you the option, I said look, you can do one of two things, you can object to the answer and I will strike it and I will ask the jury to disregard it. Or based on your strategy or tactic, you may choose to ignore it and move on so as not to bring further attention to the issue. And you chose to move on." Defense counsel explained, "I advised the Court that I would move on because it would simply highlight that fact; however, after the second time where I do not believe that I had opened the door, that is grounds for a mistrial." The trial court observed, "[t]he words 'probation officer' was [*sic*] never mentioned in the second answer."

The court denied the motion for mistrial, stating: "[T]he Court does not believe this rises to a level of granting a motion for mistrial and starting this trial all over again. I

7

do not feel that the prejudice is so great that a mistrial should be ordered. [¶] I did offer [Ray's counsel] the opportunity to strike and I would strike the answer and tell the jury to disregard it. [Counsel] chose -- and I do not disagree at all with his choice. [He] chose to move past it and not highlight it. I do not feel that a mistrial is appropriate. The questions did not come from the Prosecution. It came from the Defense. I do instruct [the prosecutor] to reiterate with his witness never to mention a probation officer." The prosecutor responded, "Understood."

Denial of a motion for mistrial based on the erroneous admission of other crimes evidence lies in the trial court's discretion. (*People v. Welch* (1999) 20 Cal.4th 701, 749.) "There is little doubt exposing a jury to a defendant's prior criminality presents the possibility of prejudicing a defendant's case and rendering suspect the outcome of the trial." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1580.) However, the trial court should grant a motion for mistrial "only when ' " a party's chances of receiving a fair trial have been irreparably damaged," ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 282), that is, if the court is "apprised of prejudice that it judges incurable by admonition or instruction." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) Most motions for mistrial involve prosecutorial misconduct, but a witness's volunteered statement can support a finding of incurable prejudice. (*Harris, supra*, at p. 1581.) "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*Haskett, supra*, at p. 854.) Reversal of the denial of a mistrial motion is called for only where the result would have been more favorable for the defendant if prejudicial information about his or her parole or probation status had not been divulged to the jury. (*People v. Allen* (1978) 77 Cal.App.3d 924, 935.)

The first reference to Ray's probation was fleeting and the second reference did not even mention probation. The prosecutor did not attempt to capitalize on the probation officer remark. Our Supreme Court has held that the fleeting mention of

8

evidence of the defendant's past criminality does not require a mistrial. (*People v. Valdez* (2004) 32 Cal.4th 73, 124 [where a witness's reference to defendant having been at " 'Chino Institute' " was brief and isolated, the trial court properly denied the motion for mistrial]; *People v. Bolden* (2002) 29 Cal.4th 515, 554-555 [witness's reference to obtaining defendant's address from "the parole office" was "not significant in the context of the entire guilt trial"]; *People v. Collins* (2010) 49 Cal.4th 175, 197, 199 [defendant's girlfriend's reference to "Susanville" prison was "brief and ambiguous"].)[2]

Ray relies on *People v. Allen* (1976) 65 Cal.App.3d 426 (*Allen*), for the proposition that objection and admonishment would not have cured the harm resulting from informing the jury that Ray was on probation. In *Allen*, the victim of a theft testified that the defendant offered to contact his "connections" to help locate the stolen items and made a telephone call in the presence of the victim and police officers to a person she assumed was a " 'fence' "—a term used to describe a dealer in stolen property. (*Id.* at pp. 431-432.) The trial court struck the "fence" reference. (*Id.* at p. 432.) But the appellate court reasoned that nonetheless the jury heard this and other evidence that was not struck, which impermissibly suggested the defendant possessed a character trait to associate with thieves and receivers of stolen property and acted in conformity with that trait to steal the victim's jewelry and pass it on to an associate. (*Id.* at p. 435; Evid. Code, § 1101 ["evidence of a person's character or trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion"].) The court determined that this evidence—along with other hearsay and

---

[2] The Attorney General argues that Ray forfeited any claim based on the probation officer reference, because defense counsel declined the court's offer to strike the testimony and admonish the jury to disregard it. (*People v. Valdez, supra*, 32 Cal.4th at p. 124; *People v. Bennett* (2009) 45 Cal.4th 577, 611-612 & fn. 14.) However, Ray's motion for mistrial was triggered by the second reference, which he claims implied he had a probation officer. The trial court did not renew the offer to admonish the jury but simply denied defendant's motion for a mistrial.

9

speculative evidence erroneously admitted—was sufficiently prejudicial to require reversal, i.e., it was reasonably probable that a result more favorable to the defendant would have been reached absent these errors. (*Allen, supra*, at p. 437.) The court noted that "[t]he evidence against defendant was all circumstantial and not particularly compelling." (*Ibid.*)

We disagree with Ray's contention that, as in *Allen*, the evidence against him was "completely circumstantial and not that compelling." The evidence may have been circumstantial but it was overwhelming. Ray's car was abandoned after police pursuit with his cell phone and wallet containing his ATM card and identification inside. In the police interview, Ray denied knowing Kempton but both Ray's and Kempton's cell phones had dozens of calls between them in the period immediately before the burglary and Ray's phone contained photos of the CVS in Woodland. Ray's phone also contained a text message exchange with his girlfriend around the time of the burglary—at which time he claimed he did not have his cell phone because it was in the supposedly stolen car—stating, "OMW back. It was bad."

Further, in the interview with the investigator, Ray made a series of inconsistent statements in an attempt to change and adapt his story to neutralize the fact that his car containing his wallet, cell phone, and identification was found abandoned after a police pursuit from the CVS. Ray argues that the defendant in *Allen* also made an inconsistent statement regarding whether he saw an intruder vault over the victim's balcony or he just assumed the intruder jumped over the balcony after running from the victim's bedroom. (*Allen, supra*, 65 Cal.App.3d at p. 431.) This inconsistent statement was isolated and minor. Ray's inconsistent statements were numerous and comprehensive. Among other things, he said: he drove his car on the night of January 5, 2017, but changed his statement to the day before because the car was in police custody on January 5; he went to a bar even though he had no wallet, ID, or ATM card because he knew the doorman at the bar and had cash; he woke up in Land Park but changed his statement to some other

10

unnamed park closer to where he claimed he left his car; he called his girlfriend to pick him up even though he had no cell phone; he agreed to provide his girlfriend's telephone number and started to do so but then said he forgot it. Nearly everything he said was inconsistent with something else he said or something he was compelled to acknowledge as fact.

This was not a close case. It is not reasonably probable that Ray would have obtained a more favorable result if his probation status had not been mentioned. (*People v. Allen, supra*, 77 Cal.App.3d at p. 935.)

### *Questions from Jurors*

Both Ray and Kempton contend that the court erred in asking only the prosecutor to pose jurors' questions to witnesses, thereby creating the impression that the trial court favored the prosecution.

California courts have repeatedly held that a trial court has discretion to allow jurors to submit questions to be asked of witnesses, subject to certain procedural controls. (See, e.g., *People v. Majors* (1998) 18 Cal.4th 385, 407 (*Majors*); *People v. Cummings* (1993) 4 Cal.4th 1233, 1305, disapproved on another ground in *People v. Merritt* (2017) 2 Cal.5th 819, 831; *People v. McAlister* (1985) 167 Cal.App.3d 633, 644; *People v. Gates* (1979) 97 Cal.App.3d Supp. 10, 13-15.) The trial court may not allow jurors to question witnesses directly. (*McAlister, supra*, at pp. 644-645.) Questions should be written down and submitted for consideration by the court and counsel. (*Cummings, supra*, at p. 1305; *McAlister, supra*, at p. 644.) Questions then may be asked by court or counsel. (*Majors, supra*, at p. 407; *Cummings, supra*, at p. 1305.) The California Supreme Court has specifically approved a procedure whereby an attorney for the party who called the witness reads the question. (*Majors, supra*, at p. 407.)

In instructing the jury with CALCRIM No. 106, the trial court outlined this procedure. "If, during the trial, you have a question that you believe should be asked of a witness, you may write out the question and send it to me through the bailiff. I will

11

discuss the question with the attorneys and decide whether it may be asked. Do not feel slighted or disappointed if your question is not asked. Your question may not be asked for a variety of reasons, including the reason that the question may call for an answer that is inadmissible for legal reasons. Also, do not guess the reason your question was not asked or speculate about what the answer might have been. Always remember that you are not advocates for one side or the other in this case. You are impartial judges of the facts."

We note preliminarily that defense counsel did not object at trial to the prosecutor asking the jurors' questions, thereby forfeiting any claim of error. (*People v. Cook* (2006) 39 Cal.4th 566, 592.)

In any event, the claim lacks merit. In *Majors*, the defendant also asserted that the prosecutor should not have been the one to ask the jurors' questions. (*Majors, supra*, 18 Cal.4th at p. 407.) The court explained there was no error because "the trial court permitted the party who had called a witness to ask the jurors' questions. The fact the prosecutor asked most of the questions reflects nothing more than the fact the prosecution called most of the witnesses." (*Ibid.*)

Here, neither Ray nor Kempton called any witnesses. Accordingly, the court asked counsel for the party who called the witness—in each instance, the prosecutor—to read the jurors' questions to the witness. This is the procedure approved by the California Supreme Court and the trial court did not err in following it.

*Cumulative Error*

Conceding that the above claimed "error in the trial court only asking the prosecutor to read the jury questions is less clear," Ray contends that this procedure together with denial of his motion for a mistrial constitutes prejudicial cumulative error that denied him due process and mandates reversal. Since we have " 'either rejected on the merits defendant's claims of error or have found assumed errors to be nonprejudicial[,] [w]e reach the same conclusion with respect to the cumulative effect of

12

any [purported] errors.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Melendez* (2016) 2 Cal.5th 1, 33 ["[W]e have found no error to cumulate. Any assumed error was harmless, even accumulated"].)

*Sentencing Continuance*

Kempton additionally claims that the trial court abused its discretion in refusing to grant his counsel a four-week continuance to submit a sentencing brief, or alternatively that counsel was ineffective for failing to submit a timely brief. We find no abuse of discretion and no ineffective assistance of counsel.

On April 10, 2018, the jury returned a guilty verdict and the trial court initially set a sentencing hearing for May 4, 2018. Kempton's counsel informed the court she would be on vacation from May 1 through 13 and suggested April 30 as an alternative date. On April 24, the prosecution filed a sentencing brief for both defendants.

On April 30, 2018, Kempton and Kempton's counsel appeared for the sentencing hearing. Kempton's counsel requested a continuance, arguing that she had just received the prosecution's sentencing brief and wished to file a brief in response. Counsel asked for four weeks because she was going to be on vacation for two weeks starting the next day. The prosecutor argued that a defense sentencing brief could have been filed before the prosecution's brief because a defense brief is not a responsive pleading. The prosecutor also argued counsel had not stated good cause for failing to file a timely defense brief. The trial court ruled that there was no good cause to continue Kempton's sentencing. Kempton's counsel then offered the explanation that she did not get the prosecution's sentencing brief until April 27 because she does not get her mail quickly. The trial court thereupon agreed to allow counsel to respond orally to the prosecution's sentencing brief and trailed the sentencing hearing until the afternoon.

Counsel for Kempton argued for a lower term with a 50-50 split recommended by the probation report, instead of the upper term also recommended by the probation report and the split with a significantly higher percentage of incarceration sought by the

prosecutor. While acknowledging Kempton's past convictions, counsel noted, among other things, that since he was arrested he had been out on bail, not gotten into any further trouble, showed up for his court appearances, found work as a handyman despite his pending criminal case, had worked diligently to support himself, was seeking to join a labor union, and was living with his grandmother whom he helped with chores. Counsel argued that Kempton was low risk to re-offend, relatively young, and committed to becoming a law-abiding citizen. Counsel noted that Kempton had family support, stable housing, and a career path planned that would give him financial stability.

Counsel introduced Kempton to make a statement to the trial court in favor of a lower term sentence. He stated that he had been a productive member of the community while his case was pending and looked to continue to do so. But an upper term sentence would make work harder to find, though. He concluded: "I just like to work, and don't ever want to be in a courtroom again."

The prosecutor argued that Kempton's extensive record of pharmacy burglary arrests and convictions, including his last conviction where he was sentenced to the middle term, and his active role in the present crime, made him "somebody who is deserving of the upper term, and, frankly, he's not deserving of any split, let alone a 50/50 split. I propose a 90/10 split, if the Court wants to retain some jurisdiction over him for an issue such as restitution."

The trial court sentenced Kempton to the upper term of three years plus one year for the prior prison term, finding that the factors in aggravation outweighed the factors in mitigation, "even considering all the . . . factors your attorney outlined . . . ." The court found a split sentence to be appropriate, half to be served in custody and the remainder under mandatory supervision.

"Continuances shall be granted only upon a showing of good cause." (§ 1050, subd. (e).) " 'The determination of whether a continuance should be granted rests within the sound discretion of the trial court . . . .' [Citation.] Absent a showing of abuse of

14

discretion and prejudice to the defendant, the denial of a motion for continuance does not require reversal. [Citation.]" (*People v. Jacobs* (2007) 156 Cal.App.4th 728, 735-736.) " '[A]n order of denial is seldom successfully attacked.' [Citation.]" (*People v. Beeler* (1995) 9 Cal.4th 953, 1003 (*Beeler*), abrogated on another ground in *People v. Edwards* (2013) 57 Cal.4th 658, 705.)

"An important factor for a trial court to consider is whether a continuance would be useful. [Citation.]" (*Beeler, supra*, 9 Cal.4th at p. 1003; *People v. Jenkins* (2000) 22 Cal.4th 900, 1038; *People v. Mungia* (2008) 44 Cal.4th 1101, 1118.) Kempton has not explained how a continuance would have been useful here. Kempton argues that information provided by the intended sentencing brief would have been material to the court's sentencing choices, but does not identify any additional information that his counsel would provide that was not included in oral argument. Kempton's counsel referred to "some documentation" regarding Kempton she wanted to provide, but did not describe what these documents might be. The trial court plainly did not believe that a continuance would be useful. And it is mere speculation that a continuance for four weeks would have resulted in a lighter sentence than the one Kempton received.

Moreover, the record does not indicate that Kempton's substantial rights were violated. He had a sentencing hearing where he was given an opportunity to be heard and his counsel argued on his behalf. Kempton has failed to establish that the trial court abused its discretion when it denied a continuance.

In the alternative, Kempton offers a cursory argument that his counsel rendered ineffective assistance in failing "to submit a brief which presented appellant, his crime and his criminal past in a credible and favorable light. . . . [I]n light of the sentencing choices required of the court, it is reasonably probable that a result more favorable to appellant would have occurred had counsel prepared and filed the intended sentencing brief."

15

To claim ineffective assistance of counsel, Kempton must establish not only deficient performance but also resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674]; *People v. Davis* (1995) 10 Cal.4th 463, 503.) Even assuming deficient performance—notwithstanding counsel's apparently effective oral argument—Kempton cannot show prejudice, i.e., that he would have received a more favorable sentence if counsel had submitted a brief. As the prosecutor argued, there was no basis for a lower sentence when Kempton had received the middle term for his previous conviction for burglarizing a pharmacy. It is clear that the trial court would have made the same sentencing decision had defense counsel submitted a brief as well as oral argument. Kempton has not established ineffective assistance of counsel.

*Senate Bill No. 136*

We granted Kempton's motion to recall the remittitur and reinstate the appeal in light of Senate Bill No. 136 (2019-2020 Reg. Sess.), which amends section 667.5, subdivision (b) to eliminate one-year enhancements for prior prison terms, with the sole exception of sexually violent offenses.

Prior to the amendment, section 667.5, subdivision (b), provided in relevant part: "where the new offense is any felony for which a prison sentence or sentence of imprisonment in a county jail . . . is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term . . . for any felony . . . ." (Former § 667.5, subd. (b).) Senate Bill No. 136, signed by the Governor on October 8, 2019, amended this provision in relevant part to substitute "for a sexually violent offense" in place of "for any felony." This amendment became effective January 1, 2020. (Stats. 2019, ch. 590, § 1.)

The trial court imposed one year under the current version of section 667.5, subdivision (b) for a prior prison term Kempton served for second degree burglary (§§ 459, 460, subd. (b)) and reckless evasion of a peace officer (Veh. Code, § 2800.2), not for a sexually violent offense.

16

In supplemental briefing, the parties are in agreement that the amendment to section 667.5, subdivision (b) is retroactive to all cases not yet final on appeal.  Given the recall of the remittitur, Kempton's case is not final on appeal.  (Cal. Rules of Court, rule 8.272(c)(2); *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 166 ["the recall of the remittitur had the effect of reinstating the court's jurisdiction over the appeal"].)

## DISPOSITION

The one-year prior prison term enhancement imposed on Kempton under section 667.5, subdivision (b) is stricken.  The judgments are otherwise affirmed.  The trial court is directed to prepare a corrected abstract of the judgment against Kempton and to forward a certified copy to the Department of Corrections and Rehabilitation.

            /s/
        RAYE, P. J.


We concur:


    /s/
BLEASE, J.


    /s/
MAURO, J.