18CA2058 Peo v McClearen 10-21-2021 COLORADO COURT OF APPEALS Court of Appeals No. 18CA2058 Teller County District Court No. 17CR116 Honorable Lin Billings Vela, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Kevin Lee McClearen, Defendant-Appellant. JUDGMENT AFFIRMED Division I Opinion by JUDGE KUHN Dailey and Dunn, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced October 21, 2021 Philip J. Weiser, Attorney General, Erin K. Grundy, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Megan A. Ring, Colorado State Public Defender, Emily Hessler, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant 
1 ¶ 1 Defendant, Kevin Lee McClearen, appeals the judgment of conviction entered after a jury found him guilty of stalking — serious emotional distress, harassment — strike, shove, kick, and three counts of violation of a protection order (VPO). We affirm. I. Background ¶ 2 McClearen and N.C. married in February 2017. On May 2, N.C. returned home from Indiana, where she’d spent much of the prior few months caring for her terminally ill father. About forty minutes after she got home, the couple started arguing because McClearen wanted to have sex but N.C. was too tired and because McClearen accused N.C. of being unfaithful. The argument continued all night. N.C. described McClearen’s demeanor as “very irrational, very animated, loud” and stated that she couldn’t get him to calm down. ¶ 3 Lori Shifflet, N.C.’s lifelong friend, witnessed much of the argument and recorded about forty minutes of it. Two video clips of the recordings were admitted at trial. ¶ 4 The next morning, things escalated. N.C. testified that McClearen chest bumped her and poked her chest. In response, after telling him to get away from her, N.C. punched McClearen in 
2 the chest. McClearen called 911, law enforcement responded, and arrested him after determining that he was the initial aggressor and had provoked N.C. into punching him. ¶ 5 Based on McClearen’s arrest, a protection order was issued that listed N.C. as the protected party. The protection order prohibited McClearen from having any contact with N.C. and mandated that he vacate their shared home. ¶ 6 On a near-daily basis for a few weeks after the first protection order was issued, McClearen repeatedly contacted N.C. by text message, phone, and Facebook Messenger. ¶ 7 McClearen showed up at the house multiple times during that period. Three days after the protection order was issued, he sent N.C. a picture of himself that was taken in the house’s garage. ¶ 8 On May 8, after hearing McClearen’s truck come down the road, N.C. saw him park in a second driveway that led to the garage. N.C. called 911 and watched through the window from a hallway as McClearen walked up to the back sliding glass door, called out to her, and tried to open the door. 
3 ¶ 9 Law enforcement responded and stopped McClearen as he was leaving the neighborhood. McClearen was arrested, and a second protection order was issued. ¶ 10 McClearen continued to repeatedly contact N.C. after that arrest and sent her messages numbering in the double digits nearly every day during the third week of May. ¶ 11 On June 1, a neighbor delivered an envelope from McClearen to N.C. The envelope contained legal papers to initiate annulment proceedings but didn’t contain any personalized communication from McClearen. N.C. and Shifflet called the police. ¶ 12 In early June, the communication died down. Then, on July 18, McClearen texted N.C. his son’s phone number. On July 21, he texted N.C “where are my personal files, titles insurance for work all son’s stuff from court.” ¶ 13 On October 22, McClearen and one of his employees met up in the parking lot of a grocery store where N.C. worked so that they could drive to a jobsite together. The store wasn’t open yet, but N.C. was already working and saw McClearen in the parking lot when she went outside for a smoke break. She called law enforcement. 
4 ¶ 14 For his conduct between May and October, as relevant here, the prosecution charged McClearen with stalking — serious emotional distress, harassment for the initial physical altercation, and multiple counts of VPO. ¶ 15 At the close of trial, the jury found McClearen guilty of one count of stalking, one count of harassment, and three counts of VPO: one for the May 8 contact; one for contact from May 15 through May 18; and one for the July 21 contact.1 The jury found that McClearen committed all of the offenses as acts of domestic violence. The court sentenced McClearen to an aggregate term of eight years in the custody of the Department of Corrections. II. Analysis ¶ 16 On appeal, McClearen contends as follows: (1) the stalking — serious emotional distress statute is unconstitutionally overbroad on its face; (2) the evidence was insufficient to support his stalking conviction; (3) the evidence was insufficient to support his VPO convictions; (4) the court erred by giving a quasi-testimonial answer 1 The court granted McClearen’s motion for judgment of acquittal on the three remaining VPO counts. 
5 in response to a jury question that directed a verdict for the prosecution; (5) the court erroneously denied his motion for a mistrial after a witness testified to inadmissible prior bad act evidence; and (6) the court violated his right to be present when it gave the jury a mid-deliberation instruction and played video evidence in his absence. We address his arguments in turn. A. Constitutionality of the Stalking — Serious Emotional Distress Statute ¶ 17 McClearen first contends that the stalking — serious emotional distress statute is unconstitutionally overbroad on its face. Relying on another division’s recent decision in People v. Pellegrin, 2021 COA 118, we disagree. 1. Standard of Review and Legal Standards ¶ 18 We review a facial constitutional challenge to a statute de novo. People v. Plemmons, 2021 COA 10, ¶ 9 (cert. granted Sept. 13, 2021). We presume that statutes are constitutional, and the burden is on the defendant to prove that the challenged statute is unconstitutional beyond a reasonable doubt. Pellegrin, ¶ 29; Plemmons, ¶ 9. 
6 ¶ 19 A statute is overbroad if its scope is so broad that it restricts or has a chilling effect on constitutionally protected speech. People v. Graves, 2016 CO 15, ¶ 12. Under the overbreadth doctrine, a litigant may facially challenge a law that impacts activity protected by the First Amendment, even where the litigant’s own conduct is not protected. Id. at ¶¶ 12-13. ¶ 20 To prevail, “a litigant must show that the overbreadth of the statute is both real and substantial, judged in relation to the statute’s plainly legitimate sweep.” Id. at ¶ 14. Unless the statute reaches a substantial amount of constitutionally protected speech, an overbreadth challenge fails. Id. at ¶ 15. Where a statute reaches protected speech but is not substantially overbroad, whatever overbreadth may exist should be addressed on a case-by-
case basis. Id. 2. Discussion ¶ 21 Under section 18-3-602(1)(c), C.R.S. 2021, [a] person commits stalking if directly, or indirectly through another person, the person knowingly . . . [r]epeatedly follows, approaches, contacts, places under surveillance, or makes any form of communication with another person . . . in a manner that would cause a reasonable person to suffer serious emotional 
7 distress and does cause that person . . . to suffer serious emotional distress. ¶ 22 McClearen acknowledges that our supreme court rejected a facial overbreadth challenge to a substantially similar statute in People v. Cross, 127 P.3d 71 (Colo. 2006), but asks us to depart from its holding in light of the United States Supreme Court’s decision in Reed v. Town of Gilbert, 576 U.S. 155 (2015). ¶ 23 In Cross, the supreme court held that the stalking statute then in effect was not overbroad and did not sweep in a substantial amount of constitutionally protected speech because it only criminalized conduct of a particular nature — repeated acts of “inappropriate intensity, persistence, and possessiveness” that had a particular effect — objectively and subjectively causing serious emotional distress. 127 P.3d at 79 (quoting § 18-9-111(4)(a), C.R.S. 2005)). That category of conduct is not constitutionally protected. Id. ¶ 24 In Reed, the Supreme Court struck down a municipal ordinance that exempted certain categories of signs including “[i]deological” signs, “[p]olitical” signs, and “[t]emporary [d]irectional [s]igns [r]elating to a [q]ualifying [e]vent, loosely defined as signs 
8 directing the public to a meeting of a nonprofit group” from its prohibition on the display of outdoor signs without a permit. 576 U.S. at 159-60. The Court held that the ordinance was content based on its face because how signs were regulated depended entirely on their communicative content. Id. at 164. ¶ 25 Content-based laws — those that target speech based on its communicative content — are presumptively unconstitutional and subject to strict scrutiny, meaning they can only be justified if the government proves that they are narrowly tailored to serve compelling state interests. Id. at 163. Content-based laws include those that are facially neutral but cannot be “justified without reference to the content of the regulated speech,” or that were adopted by the government “because of disagreement with the message [the speech] conveys.” Id. at 164 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). ¶ 26 McClearen argues that, under Reed, the stalking — serious emotional distress statute is a content-based regulation that is presumptively unconstitutional and subject to strict scrutiny. He contends that, after Reed, Cross is no longer valid precedent 
9 because it applied an incorrect standard of review and level of scrutiny. We disagree. ¶ 27 As Pellegrin holds, Colorado’s stalking statute isn’t content based. ¶ 34. The statute doesn’t target speech based on its communicative content but instead proscribes a specific type of conduct: repeated actions that would cause a reasonable person to suffer serious emotional distress. Id. “‘[T]he statute does not criminalize innocuous behavior,’ but criminalizes a series of conduct without a significant impact on constitutionally protected speech.” Id. (quoting Cross, 127 P.3d at 78-79). Because the statute isn’t content based, it isn’t presumptively unconstitutional or subject to strict scrutiny. Cross remains good law and we are bound by its result. ¶ 28 As we are bound by Cross, we also reject McClearen’s reliance on People v. Relerford, 2017 IL 121094, a case where the Illinois Supreme Court held that a stalking statute similar to Colorado’s was unconstitutionally overbroad. See People v. Richardson, 181 P.3d 340, 343-45 (Colo. App. 2007); see also People v. Smith, 183 P.3d 726, 729 (Colo. App. 2008) (rejecting defendant’s argument 
10 that supreme court precedent was wrongly decided because we are bound by Colorado Supreme Court decisions). B. Sufficiency of the Evidence, Stalking ¶ 29 Next, McClearen contends that the People presented insufficient evidence to support his stalking conviction. We disagree. 1. Standard of Review and Legal Standards ¶ 30 We review challenges to the sufficiency of the evidence de novo. McCoy v. People, 2019 CO 44, ¶ 34; Maestas v. People, 2019 CO 45, ¶ 2. In evaluating a sufficiency challenge, we consider whether the evidence, when viewed as a whole and in the light most favorable to the prosecution, was substantial and sufficient to support a conclusion by a reasonable mind that the defendant was guilty beyond a reasonable doubt. People v. Wagner, 2018 COA 68, ¶ 29; People v. Perez, 2016 CO 12, ¶ 8. ¶ 31 To obtain a stalking — serious emotional distress conviction, the prosecution must prove objective and subjective elements: that the defendant’s conduct would cause a reasonable person to suffer serious emotional distress and that the conduct actually caused the 
11 victim serious emotional distress. § 18-3-602(1)(c); see Cross, 127 P.3d at 77. 2. Discussion ¶ 32 McClearen argues that the People presented insufficient evidence on the objective element. He contends that his conduct towards N.C. was relatively innocuous and typical of someone experiencing a contentious marital breakdown. He argues that his conduct, while likely to cause a reasonable person to experience ordinary frustration, annoyance, or apprehension, would not cause a reasonable person in N.C.’s position to experience serious emotional distress. ¶ 33 We disagree. The evidence presented at trial showed that McClearen repeatedly contacted N.C. (sometimes sending over forty messages per day) across multiple communication platforms on a near-daily basis in the weeks following his initial arrest. He came to the house — which was located in an area that took law enforcement a long time to respond to — multiple times. Once, he sent N.C. a picture of himself in the home’s garage. Another time, after N.C. stopped responding to his messages, he showed up in the 
12 evening, tried to open the back door, and called out N.C.’s name as she hid inside. ¶ 34 Importantly, he did all of these things in violation of court orders. In the span of a month, the court issued three separate protection orders that prohibited McClearen from contacting N.C. or visiting the house. Despite being arrested multiple times, he continued to repeatedly violate the protection orders. ¶ 35 Taken together, this evidence, when viewed in the light most favorable to the prosecution, was sufficient to show McClearen’s conduct would cause a reasonable person to experience serious emotional distress. See Wagner, ¶ 29 C. Sufficiency of the Evidence for the VPO Convictions ¶ 36 McClearen contends that the VPO convictions must be vacated because the prosecution presented insufficient evidence that he was personally served with the protection orders or that he acquired actual knowledge of their contents from the court or law enforcement. See § 18-6-803.5, C.R.S. 2021. We are not persuaded. ¶ 37 At trial, the prosecution admitted three protection orders into evidence: the first was dated May 4, the second May 9, and the 
13 third June 14. Each order bore the seal of the Teller County Combined Courts. N.C. confirmed the orders were signed by McClearen, testifying that she recognized his handwriting, having seen his signature “many, many, many times.” Above McClearen’s signature, each of the orders states that “[b]y signing, I acknowledge receipt of this Order.” ¶ 38 The prosecution also presented evidence that on May 8, after being at the house, McClearen sent N.C. a message that said, “I hope you did not call the cops on me for nothing, just needed tools or I’m not working . . . .” On May 14, N.C. texted McClearen, “[w]e could have had the protection order changed, but you have to — you have to have it right now or it’s over.” ¶ 39 Notably, three separate law enforcement officers testified that they’d discussed the existence of protection orders with McClearen. ¶ 40 Deputy Maria Meyers testified that she contacted McClearen on May 8 after N.C. called 911 to report he’d been at the house. Deputy Meyers specifically discussed the protection order with McClearen, but McClearen told her he hadn’t been aware there was a protection order in place before he went to the house. Following 
14 the conversation, McClearen was arrested and transported to the county jail. ¶ 41 Deputy Sinel Lilic testified that he interviewed McClearen on May 28 regarding a report that McClearen had been riding his motorcycle near the house. In response, McClearen told Deputy Lilic that “he was just going to a neighbor’s house.” ¶ 42 Deputy Jacqueline Gaffney testified that, when she spoke to McClearen outside the grocery store in October, he acknowledged that he knew a protection order was in place but didn’t believe he violated it. ¶ 43 It’s true that much of the evidence supporting the convictions was circumstantial. But, a defendant’s knowledge may be inferred from circumstantial evidence. People v. Donald, 2020 CO 24, ¶ 37. There was evidence before the jury that would have allowed it to make the inferences necessary to conclude McClearen had actual knowledge of the protection orders — i.e. that he was the one who signed the orders, that the court followed the law and properly 
15 advised him of the contents of the orders when they were issued,2 that his May 8 text to N.C. about not calling the police was a tacit admission that he knew he wasn’t allowed to go to the house, and that Deputy Meyers fully explained the contents of the protection orders when she arrested McClearen on May 8. ¶ 44 While the presence of stacked inferences is one factor a court can consider, it is not alone dispositive of a sufficiency claim. See id. at ¶ 17. And here, the chain of inferences is not so attenuated that it would be unreasonable for us to rely on it to sustain the VPO convictions. See id. at ¶ 30. ¶ 45 Overall, the evidence, when viewed as a whole and in the light most favorable to the prosecution, was substantial and sufficient to support the convictions. See id. at ¶ 18. D. Jury Question ¶ 46 McClearen contends that if we don’t vacate his VPO convictions, we should reverse them because the court erred by 2 Even if the admission of this evidence was in error, “[i]n reviewing a sufficiency of the evidence contention, an appellate court must consider evidence that should have been excluded at trial.” People v. Alemayehu, 2021 COA 69, ¶ 15 n.2. 
16 answering a jury question in a manner that directed a verdict for the prosecution. We conclude that even if there was error here, it isn’t reversible. 1. Standard of Review ¶ 47 “[T]he decision of whether to ask a juror’s question is committed to the sound discretion of the trial court.” Medina v. People, 114 P.3d 845, 847 (Colo. 2005). Whether to provide additional instructions in response to a jury question is also left to the trial court’s discretion. People v. Burnell, 2019 COA 142, ¶ 36. The trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair, or where it is based on an erroneous view of the law. People v. Manzanares, 2020 COA 140M, ¶ 28. ¶ 48 Because defense counsel did not preserve the issue, we review for plain error. Hagos v. People, 2012 CO 63, ¶ 14. “[P]lain error occurs when there is (1) an error, (2) that is obvious, and (3) that so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.” Cardman v. People, 2019 CO 73, ¶ 19. 
17 2. Discussion ¶ 49 At the end of Shifflet’s testimony, a juror submitted a question to the court asking, “[d]id Kevin have the option of not signing the protection order?” ¶ 50 The parties discussed the question at the bench. The court noted that, by statute, a defendant is required to be advised and acknowledge the protection order in court and in writing and that a defendant can’t bond out without signing the protection order. Defense counsel pointed out that a defendant can choose not to sign the protection order and remain in custody. ¶ 51 In response to the question and without objection from the defense, the court, quoting the applicable statute, instructed the jury: And then next is a question about whether or not [McClearen] had the option of not signing the protection order. I’m just going to read to you directly from the statute, the pertinent part of the statute, the court is required to advise the defendant on the record of the protection order. And the court shall further require the defendant to acknowledge the protection order in court and in writing prior to the release as a condition of any bond further release of the defendant. 
18 ¶ 52 Even if we assume it was incorrect of the trial court to instruct the jury on a point of law during witness testimony, we conclude that any such error wasn’t substantial here. An error is substantial if it so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the conviction. People v. Marx, 2019 COA 138, ¶ 11. Here, even without the court’s instruction, the evidence of guilt was overwhelming. See People v. Miller, 113 P.3d 743, 750 (Colo. 2005) (“[A]n erroneous jury instruction does not normally constitute plain error . . . where the record contains overwhelming evidence of the defendant’s guilt.”). As described in Part II.C, the evidence of guilt — that McClearen signed the protection orders, discussed them with law enforcement when he was arrested on May 8 and again on May 28, and that his statements in the text messages implicitly acknowledge the existence of the protection orders — was overwhelming. E. Mistrial ¶ 53 McClearen next contends that the court erred by denying his motion for a mistrial after a prosecution witness testified to inadmissible evidence. We disagree. 
19 1. Standard of Review ¶ 54 We review the court’s denial of a request for a mistrial for abuse of discretion. People v. Chirinos-Raudales, 2021 COA 37, ¶ 26. The trial court abuses its discretion “only when inadmissible evidence is likely to have substantially prejudiced the jurors despite the use of any alternative remedies.” Id. (quoting People v. Salas, 2017 COA 63, ¶ 9). A mistrial is the most drastic of remedies and is only warranted where the prejudice to the defendant is too substantial to be cured by other means. Id. at ¶ 27. 2. Discussion ¶ 55 On May 3, Detective Gaffney responded to McClearen’s initial 911 call and interviewed him at the house. On direct examination, the prosecutor questioned Detective Gaffney about the interview: Prosecutor: Okay. What did [McClearen] tell you? Detective Gaffney: Um, he stated that he had called 911 because he and his wife, who he identified as N.C., had been in a verbal argument, and during that argument she had struck him in the chest, one time. Prosecutor: And did he say anything else about what he wanted to have happen out of the situation? 
20 Detective Gaffney: Um, [McClearen] stated, um, that he had been in a similar situation, and that he believed it was her turn to go to jail this time. ¶ 56 Defense counsel objected on CRE 404(b) grounds and requested a mistrial. Finding that the testimony was vague and ambiguous, the court denied the motion but offered to provide a curative instruction. After expressing concern that highlighting the evidence would do more harm than good, the defense declined the offer. ¶ 57 For three reasons, we conclude that the trial court — which was in a better position to contemporaneously evaluate any adverse effect the improper testimony had on the jury — acted within its discretion in denying the motion. See People v. Van Meter, 2018 COA 13, ¶ 9. ¶ 58 First, the testimony was vague and ambiguous. See Salas, ¶ 12. Detective Gaffney didn’t provide detailed testimony of any specific incidents, and the record supports the court’s finding that it wasn’t entirely clear that the testimony referred to McClearen’s prior criminality. 
21 ¶ 59 Second, the testimony was fleeting, which minimized its potential prejudice. See People v. Compos, 2019 COA 177, ¶ 37, aff’d in part, vacated in part, 2021 CO 19, ¶ 4. It encompassed three lines of transcript in a three-day trial featuring multiple witnesses, the majority of whom testified in detail about more serious allegations of criminality. See People v. Krueger, 2012 COA 80, ¶ 72 (the district court didn’t abuse its discretion in denying a mistrial where the reference to inadmissible evidence was brief and the court offered to give a curative instruction, which the defense declined). ¶ 60 Third, there’s no indication in the record that the prosecutor intentionally elicited the information. See People v. Johnson, 2017 COA 11, ¶ 46; see People v. Everett, 250 P.3d 649, 662 (Colo. App. 2010) (“A motion for a mistrial is more likely to be granted where the prosecutor intentionally elicited improper character evidence.”). Though the prosecutor objected to the motion, she made an offer of proof that she expected a different, admissible answer to her question, acknowledged that she hadn’t properly prepared the witness, and apologized to the court for introducing inadmissible evidence. 
22 F. Right to Be Present ¶ 61 Finally, McClearen contends that the trial court violated his right to be present by allowing the jury to re-watch video exhibits during deliberations and providing an additional instruction while he was absent from the courtroom. We perceive no error. 1. Additional Background ¶ 62 After the jury retired to deliberate, the court informed defense counsel of its standard procedure for handling jury requests to re-watch video exhibits and asked if the defense wanted to be notified: Court: All right. Typically what I do, [defense counsel], is if there’s a request to view the video, I give them the – the Duval instruction that they’re allowed to view it once without any communication occurring in front of my staff. It is a supervised viewing and not to pay any undue attention to it. I can get the exact wording of that instruction for you. Would you want to be notified if I get a request to watch the video? Defense counsel: No, I mean I – I’d like to find out, but it doesn’t have to be when it happens. ¶ 63 The court didn’t ask the defense whether McClearen himself wished to be notified or whether he wanted to be present if the jury watched the videos. Aside from saying that she didn’t wish to be 
23 notified, defense counsel did not make any statements regarding McClearen’s position on whether he wanted to be present. The court told McClearen that he didn’t have to stay in the courthouse during deliberations, but that he needed to stay within a five-minute radius of the building. ¶ 64 During deliberations, the jury asked to re-watch the videos from the night of the initial incident. Before playing the recordings, the court instructed the jury, “[l]adies and gentlemen of the jury, you may observe the videotape one time in open court and not to give it any special weight. No juror questions are permitted during viewing. My staff is available to assist you in the operation of the computer.” ¶ 65 A juror asked, “did you say we’re allowed to watch it once?” The court responded, “if there’s a problem with — you need something repeated, yeah. But if something couldn’t — you couldn’t hear it, and you need it replayed — I understand the acoustics here are terrible; maybe we should just close all the windows while you’re hearing and viewing it — and if there’s an issue, she can rewind that part.” 
24 ¶ 66 The jury watched Exhibit 2B in its entirety. Then, it submitted a written request to re-watch the second portion of the video. The court granted the request and replayed the second section of the video. The court did not notify the prosecutor, defense counsel, or McClearen about the jury’s request or its decision to replay the video. 2. Standard if Review and Legal Standards ¶ 67 Whether a trial court violated a defendant’s right to be present is a constitutional question that we review de novo. People v. Guzman-Rincon, 2015 COA 166M, ¶ 29. A criminal defendant has the right to be present at all critical stages of the prosecution. Zoll v. People, 2018 CO 70, ¶ 19. But the right to presence is not absolute. Id. at ¶ 20. The defendant’s presence is “only required ‘to the extent that a fair and just hearing would be thwarted by his absence.’” Id. (quoting Kentucky v. Stincer, 482 U.S. 730, 745 (1987)). A defendant’s presence “is not constitutionally guaranteed when the defendant’s presence would be useless or when the benefit of the defendant’s presence would be ‘but a shadow.’” Id. (quoting Stincer, 482 U.S. at 745). 
25 ¶ 68 This court has previously determined that replaying a tape that had previously been played during the trial was not a critical stage of the proceedings. People v. Valdez, 725 P.2d 29, 33 (Colo. App. 1986). In replaying the tape, the jury was “merely examining a piece of real evidence.” Id. The presence of counsel may also not be necessary depending on the particular facts of the court’s playback procedures. People v. Auman, 67 P.3d 741, 766 (Colo. App. 2002), as modified on denial of reh’g (Nov. 14, 2002), rev’d on other grounds, 109 P.3d 647 (Colo. 2005). 3. Discussion ¶ 69 Under these circumstances, we conclude that the court did not violate McClearen’s right to be present. Any deviation from the playback procedure described to the defense was minor. The court did not provide any new information but merely restated an instruction it had already given. The clip was relatively short, was only replayed once under the “watchful eye of the trial judge,” and had been admitted into evidence and published during trial without objection. See Zoll, ¶¶ 22-27. On this record, we do not conclude that a just and fair hearing was thwarted by McClearen’s absence while the video clips were replayed for the jury. However, the better 
26 practice would be to alert all parties — and to permit counsel and the defendant to be present — when the jury requests to review a piece of evidence. III. Conclusion ¶ 70 The judgment is affirmed. JUDGE DAILEY and JUDGE DUNN concur.